ERICH MILDENBERG, Commissioner Office of the BankingCommissioner
You have asked whether sec. 112.05, Stats., makes it a criminal offense for a trust company bank or state chartered bank with trust powers to purchase or sell stock options for a securities portfolio for which it acts as trustee. For the reasons set forth below, it is my opinion that such specific activity does not constitute a crime.
Trust company banks chartered under ch. 223, Stats., and state chartered banks with trust powers obtained pursuant to sec. 221.04 (6), Stats., hold sizeable securities portfolios in various fiduciary capacities. Generally, such banks have authority to sell existing securities and reinvest in other assets, including different stocks.
Options to purchase and sell stocks in the broad sense include: "rights," which provide stockholders with a short term option to purchase additional stock from the issuing corporation at prices generally lower than the existing market; "warrants," which are often issued by corporations as a financing "sweetener" and which permit *Page 278 
purchasing of stock at a set price for a longer period of time; "calls," which are contracts giving their owner an option to buy a specified number of shares of stock at a set price at a specified time; and "puts," which are similar contracts giving their owner an option to sell a certain quantity of shares for a set price at a specified time. It is the last two options, "puts" and "calls," that are primarily the basis for your inquiry and that are today commonly referred to as "stock options."
"Puts" and "calls," until several years ago, had very limited marketability. A holder of such options could easily complete the transactions by selling or purchasing the underlying stock at the specified time. But such "put" and "call" owners were at a distinct bargaining disadvantage in attempts to sell the options themselves to put and call dealers prior to the specified exercise date. Several years ago, however, exchanges began listing and trading "puts" and "calls." "Calls" on a large number of stocks are now widely traded; fewer stocks are subject to "puts" trading. The Chicago Board Options Exchange lists several hundred "calls" and about twenty "puts." As a consequence, "puts" and "calls" have become very marketable.
The basis for your inquiry is sec. 112.05, Stats., which states:
 Trust funds; person holding prohibited from dealing in margins. Any person engaged in the business of receiving deposits of money for safekeeping, any officer or employe of any bank, banking company, or trust company, any executor, administrator, guardian, trustee, or receiver, or any other person holding property or money in any manner in a trust capacity, who shall buy, sell, deal, or traffic in any goods, stocks, grains, or other property or article of commercial barter by making or requiring any deposit, payment, or pledge of any margin or of any money or property to cover future fluctuation in the price of such goods, stocks, grains, or other property so bought, sold, dealt, or trafficked in, shall be punished by imprisonment in the Wisconsin state prisons not more than 10 years, nor less than one year. Nothing in this section prohibits any person who acts in a fiduciary capacity from using personal funds for any purpose whatever.
The central question is whether this statute not only prohibits fiduciaries from buying stocks on margin but also from buying and selling *Page 279 
stock options, specifically, "puts" and "calls." The only supreme court decision examining this statute is Shinners v. State exrel. Laacke, 219 Wis. 23, 261 N.W. 880 (1935). At the time of the decision, the last sentence of the statute was not in existence.
In Shinners, Richard T. Laacke was a director (only) of the Milwaukee Commercial Bank. Simultaneous to Laacke's prosecution pursuant to sec. 112.05, Stats., then numbered sec. 348.179, Stats. (1931), the Milwaukee Commercial Bank was in the process of liquidation by the Commissioner of Banking. The complaint alleged that Laacke purchased a large number of stocks from a Milwaukee investment house on margin "to cover future fluctuation" of price. The supreme court, however, determined that a bank director was not one of the persons prohibited under the statute (bank officers and employes) if the director was not also an officer or employe. In addition, the court, at page 26, discussed the statutory phrase "to cover future fluctuation in the price" and noted that there was no evidence that the brokerage house ever made any demand upon Laacke to increase his margin equity to protect the brokerage house against fluctuations in stock values.
A ten percent margin was standard during that period; currently a fifty percent margin is required on stocks. In Shinners, the supreme court implied that Laacke was purchasing stocks on a cash basis, even though the brokerage firm frequently advanced the purchase price to Laacke and charged him interest on such advancements. The court could have found that Laacke had a less than ten percent margin basis or a loose cash purchase basis. It chose the latter. Because Laacke was found not to be an employe or officer or otherwise come within the statute, the cash or margin distinction was academic.
The supreme court in Shinners applied the rule of strict construction to this criminal statute when it stated at pages 27 and 28:
 This prosecution is under a statute highly penal. It is a fundamental rule of criminal law that no case is to be brought within a statute charging an offense unless completely within its words; and no person is to be made subject to the provisions of a criminal statute by implication. Bishop, Statutory Crimes (2d ed.), secs. 194 and 220. This author says, sec. 194:
 "Such statutes are to reach no further in meaning than their words; no person is to be made subject to them by implication, *Page 280 
and all doubts concerning their interpretation are to preponderate in favor of the accused. Only those transactions are covered by them which are within both their spirit and their letter."
 A statutory offense, therefore, has precisely the proportions which the statute gives to it, and can have no other or greater.
(Emphasis supplied.)
In Perkins v. State, 61 Wis.2d 341, 348, 212 N.W.2d 141 (1973), the court stated: "[W]hile criminal statutes are to be strictly construed, that is a rule of construction only, and the construction of a statute only becomes relevant when the meaning of the statute is obscured." Obviously, the meaning of "deposit, payment, or pledge of any . . . money . . . to cover future fluctuation in the price" in sec. 112.05, Stats., is obscured. While it clearly prohibits purchasing stocks on margin, it is not clear as to purchasing and selling options. Options are currently purchased on a cash basis; an investor cannot buy options on margin.
Specifically, sec. 112.05, Stats., makes it a crime for those fiduciaries:
 [W]ho shall buy, sell, deal, or traffic in any goods, stocks, grains, or other property or article of commercial barter by making or requiring any deposit, payment, or pledge of any margin or of any money or property to cover future fluctuation in the price of such goods, stocks, grains, or other property so bought, sold, dealt, or trafficked in . . . .
While buying and selling stock options is not buying and selling the underlying stock I am of the opinion that a stock option as a widely recognized marketable set of rights constitutes "other property or [an] article of commercial barter." Stock options, however, cannot be purchased on margin. Therefore, I conclude that the purchase of the usual stock option is not prohibited by sec. 112.05, Stats.
Section 112.05, Stats., does cover the purchase of stock on margin wherein the margin and any call for increased margin by the dealer constitutes cover for future fluctuations in price for the dealer. Similarly, the language "to cover future fluctuation in the price of such goods, stocks, grain, or other property" clearly illustrates that the *Page 281 
prohibited margin or property would have to cover future fluctuations of the goods, stocks, grain or other property originally dealt in, bought or sold.
"Puts" and "calls" undoubtedly do not qualify as "stocks" in the above-quoted statutory language. They do, however, fall within the phrase "other property or article of commercial barter." "Puts" and "calls" are particular types of options created when someone "writes" an option, promising to purchase or sell, respectively, a certain number of shares of stock at a set price on a set date. In writing a "call," the creator or seller may own the underlying stock and the created or written option is therefore termed a "covered" option. The person writing the "call" is required to deposit the shares with a broker. Because this deposit of the shares does not "cover future fluctuation in the price of such . . . property" (the written "call"), nor does it cover future fluctuations in price of underlying stock dealt in, such activity is not prohibited by sec. 112.05, Stats.
The person writing the "call," however, may not own the underlying stock; this situation is termed an "uncovered" or "naked" option. That writer is required to maintain a margin account of at least thirty percent with a broker to insure the ability to acquire the underlying stock if the "call" is exercised on the set date. Because this margin account must be maintained at a minimum of thirty percent by the writer, using cash, warrants or convertible bonds and preferreds, it would constitute the covering of future fluctuations in the price of the underlying stock potentially sold by the writer, and thus would be prohibited by sec. 112.05, Stats. This distinction of falling within the prohibited language follows because the creators or writers of "puts" and "calls" do not control the ability to exercise the written options; only the purchasers of the options can control the transaction. Thus, the writer of the "call" is obligated at the time of writing the uncovered option to potentially sell the underlying stock not owned by such writer. Clearly, this transaction falls directly within the prohibited "selling" of "stocks" by making a payment of "margin."
Creating or writing "puts" (the writer will purchase a certain number of shares at a set price on a set date) similarly falls within the proscribed activity of sec. 112.05, Stats. The writer is also required to establish and maintain a margin account of at least thirty percent with a broker as collateral. But if the writer of the "put" were to put *Page 282 
down cash for the full set price, such activity would not be prohibited. This situation, of course, would be unusual.
Because of the uncertainty and obscurity in the language of sec. 112.05, Stats., the statute must be strictly construed. So construed, it is my opinion that a successful criminal prosecution could not be maintained against a fiduciary who buys or sells (as distinguished from "writes") stock options. As analyzed above, the writing of "covered" calls is not prohibited by sec. 112.05, Stats., as to trust company banks and state chartered banks with trust powers, but the writing of most "puts" and all uncovered "calls" is prohibited.
Whether such activities by fiduciaries violates the prudent man rule was not requested nor considered in this opinion.
BCL:LEN